UNITED STATES of America, Appellee,

v.

Henrich BAREL a/k/a Steven Katz, Appellant.

No. 90–5457.

United States Court of Appeals, Third Circuit.

Argued Jan. 22, 1991.

Decided July 17, 1991.

As Amended on Denial of Rehearing Oct. 7, 1991.

Richard A. Greenberg (argued), Newman & Schwartz, New York City, for appellant.

Michael Chertoff, U.S. Atty., Edna B. Axelrod, R. David Walk, Jr. (argued), Asst. U.S. Attys., Office of the U.S. Atty., Newark, N.J., for appellee.

Before BECKER and HUTCHINSON, Circuit Judges, and SMITH, District Judge.[*]

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

Henrich Barel (Barel), formerly known as Henry Shtakel, appeals from the judgment of conviction and sentence entered against him in the United States District Court for the District of New Jersey. The charges against Barel result from his having opened a number of bank accounts with a false social security number. A jury found him guilty of three counts of misuse of a social security number (the social security charges), in violation of 42 U.S.C.A. § 408(g) (West 1983), and three counts of making false entries in the records of banks insured by the Federal Deposit Insurance Corporation (FDIC) (the false entry charges), in violation of 18 U.S.C.A. § 1005 (West Supp.1991) and 18 U.S.C.A. § 2 (West 1969). The district court sentenced Barel under the version of the Sentencing Guidelines in effect at the time of trial instead of the version in effect when he allegedly committed these acts. This appeal followed.

Section 408(g), the basis of the social security charges, makes criminal the intentional use of a false social security number "for any ... purpose." Since Barel intentionally gave the banks a false social security number to open the accounts, we will affirm his convictions on the social security charges.[1] We do not believe, however, that Congress intended 18 U.S.C.A. § 1005 to impose criminal liability on bank customers, or that 18 U.S.C.A. § 2 otherwise allows affirmance of Barel's convictions, on this record, as an aider or abetter of the crime of making false entries in bank records. Thus, we will reverse his convictions on the false entry charges.[2] As a result, we will vacate the sentence imposed by the district court and remand for resentencing.

### I.

In September, 1989, Barel was indicted on three counts of using a false social security number to open bank accounts at City Federal Savings Bank (City Federal), National State Bank (National) and Chemical Bank (Chemical), in violation of 42 U.S.C.A. § 408(g). In January, 1990, a superseding indictment was returned. It charged him with the original three counts and added three counts of causing false entries to be made in the records of the same three federally insured banks, in violation of 18 U.S.C.A. § 1005 (West 1976 & Supp.1991) and 18 U.S.C.A. § 2 (West 1969). During pretrial proceedings Barel

---

[*] Hon. D. Brooks Smith, District Judge of the United States District Court for the Western District of Pennsylvania, sitting by designation.

[1] For the reasons given in Section VI. B., *infra,* we reject the government's invitation to avoid discussion of the merits of Barel's § 1005 convictions by application of the concurrent sentence doctrine.

[2] But for the strict limitation on our scope of review over the sufficiency of the evidence to sustain Barel's § 1005 convictions occasioned by his failure to renew his Federal Rule of Criminal Procedure 29 motion for acquittal on the § 1005 charges at the close of all evidence, there would be a serious question as to whether the Federal Bureau of Investigation case agent's vague testimony about the banks' federally insured status gave the jury enough evidence to find the existence of that essential element of the § 1005 offenses beyond a reasonable doubt. We are at a loss to understand the government's failure to produce the certificates that show federal insurance. Still, because we see no plain error or miscarriage of justice in this respect, we are constrained to reach the statutory interpretation issue Barel raises concerning § 1005's coverage. *See United States v. Wright–Barker,* 784 F.2d 161, 170–71 (3d Cir.1986) (failure to renew a Rule 29 motion at the close of all evidence substantially restricts the scope of review on appeal). For a fuller discussion of this point *see* Section VI. C. 1., *infra.*

moved, *inter alia*, for dismissal of the false entry charges, contending that § 1005 does not apply to bank customers. The district court denied this motion and proceeded to trial.

The case was tried to a jury. At the close of the government's evidence, Barel moved for dismissal of the social security charges on several grounds. His contentions centered on the argument that the evidence was insufficient to show that he intended to deceive the United States by using a false social security number. The district court denied this motion to dismiss, although it instructed the jury prior to deliberations that in order to convict on the social security charges the jurors would have to agree unanimously on whether Barel intended to deceive the United States, the banks or both. Barel also renewed his motion to dismiss the false entry charges, this time advancing two grounds. He contended once again that § 1005 does not apply to bank customers and also raised the argument that the government had failed to prove the federally insured status of the banks beyond a reasonable doubt. The district court also denied this motion but expressed some doubt about the application of § 1005 to Barel's acts. Finally, Barel moved for dismissal of the social security and false entry charges that involved Chemical, arguing that the evidence showed no account was opened there. During its deliberations, the jury asked the district court whether the counts relating to Chemical were correct in charging that Barel had opened an account there. The district court advised the jury "as a matter of law ... that the [Chemical] account was opened." Joint Appendix (App.) at 420.

Following denial of these motions to acquit, Barel called only one witness, his ex-wife's attorney. The attorney described the difficulties he had encountered in trying to collect funds that a state court had awarded Barel's ex-wife after their divorce. The attorney's testimony was brief. Neither the government nor Barel presented any further evidence. Barel did not renew his Rule 29 motion at the close of all evidence. Barel's counsel on this appeal did not represent him at trial.

The entire trial lasted only two days, and on January 31, 1990 the jury convicted Barel on all counts. Before sentencing, the government, for the first time, submitted documentary evidence in support of its contention that Barel's real purpose in using the false social security number was to deceive the United States government. Armed with this evidence, the government argued that Barel engaged in a scheme to evade approximately $740,000.00 in state and federal excise taxes on the sale of gasoline.[3]

At a hearing held on May 23, 1990, Barel disputed the government's sentencing claims as to his criminal purpose and the amount of money he owed for excise taxes. The only witness to testify was an accountant Barel called to the stand. The accountant told the district court that he had examined invoices and other documents concerning Barel's business and concluded that Barel's company had paid money to the suppliers of gasoline sufficient to cover any back taxes due. The accountant estimated the gross taxes due at about $767,000.00. Barel sought to convince the district court that he did not owe any back taxes and that even if some taxes remained outstanding, it was the fault of the gasoline suppliers. The district court rejected Barel's arguments and found by a preponderance of the evidence that he had engaged in a scheme to evade excise taxes on gasoline, resulting in a loss to the state and federal governments of as much as $767,000.00. The district court then sentenced Barel to concurrent thirty-three month terms of imprisonment and also imposed a three hundred dollar special assessment against him. It followed the sentencing guidelines in effect at the time of sentencing instead of the more lenient ones in effect at the time Barel allegedly committed these offenses. On the sentencing determination, Barel questions the district court's use of the later version of the guidelines. The

---

**3.** Curiously, the government presented no such evidence at trial. Had it done so, some of the troubling questions we deal with on this appeal might have been avoided.

government has consented to application of the earlier guidelines and agrees to remand of this matter to the district court for re-sentencing under the earlier guidelines. Barel does not challenge the findings of fact the district court made at the sentencing hearing.

## II.

Barel, a wholesale gasoline broker, obtained a social security card and other false identification bearing the name of Steven Katz. In mid–1989, Barel used the Katz name, identification and social security number to open accounts at several New Jersey banks.

In July, Barel went to City Federal and filled out an application for a business checking account in the name of Steven Katz, doing business as Enron Oil Company. Barel used the Katz social security number to open this account. He later opened a personal account at City Federal, again using the Katz name and number.

In mid-August, Barel filled out forms and opened a business checking account at National in the name of Steven Katz, doing business as Bowman Oil Company. At the end of August, Barel went to Chemical to open a business account in the name of Steven Katz, doing business as Progress Oil Company. Barel again used Katz's social security number as part of the false identity he gave to the bank. He also made an opening deposit of $100.00 cash. Chemical officials decided to verify the information Barel provided and found that he had given a false address and telephone number. Chemical then notified Barel by mail that it would not accept his account. The bank returned his one hundred dollar "opening deposit" and followed through by refusing to accept a wire transfer from Barel's National account several days later. Chemical notified National of its problems with Barel and told local law enforcement authorities about his use of the false social security number. The security office at National contacted the Federal Bureau of Investigation (FBI). On August 29, 1989, while at National, Barel was arrested. At the time of his arrest, he was in possession of a social security card bearing the name of Steven Katz, as well as other forms of identification bearing that name.

## III.

Barel appeals from a final judgment of conviction and sentence entered in the United States District Court for the District of New Jersey on May 25, 1990. The district court had jurisdiction pursuant to 18 U.S.C.A. § 3231 (West 1985). We have jurisdiction over this appeal pursuant to 18 U.S.C.A. § 3742(a) (West 1985 & Supp.1991) and 28 U.S.C.A. § 1291 (West Supp.1991).

## IV.

The issues Barel raises on appeal concerning his guilt can be grouped into two basic categories. First, he asks us to determine whether 42 U.S.C.A. § 408(g) applies to the use of a false social security number, without intent to obtain something of pecuniary value, in a transaction with a private, non-governmental, entity. In this context, he claims the jury verdict is not demonstrably unanimous in finding that he had the "intent to deceive" any one of the parties specified in the indictment. Second, he urges the reversal of his convictions under 18 U.S.C.A. § 1005, either for lack of evidence or because § 1005 applies only to bank insiders. If either of his convictions can stand, the government urges application of the concurrent sentence doctrine and asks us to exercise the discretion that doctrine provides to forego review of Barel's other conviction.[4]

---

4. Barel argued at trial, and again argues on appeal, that he never opened an account at Chemical and therefore the charges relating to that bank, Counts 3 and 6, must be dismissed. Since this opinion reverses Barel's conviction on Count 6 on other grounds we need not further address that Count. As to Count 3, we accept the government's argument that the district court's charge was at worst harmless error because "opening of an account was not an element of the [§ 408(g)] offense and had no bearing on the jury's finding of guilt on Count 3." Brief for United States at 15 n. 4.

## V.

Ordinarily, when the proper procedural mechanisms are invoked and the issue of sufficiency of the evidence is raised on appeal following conviction, all credibility issues subject to jury determination must be viewed in the light most favorable to the government. *See Government of Virgin Islands v. Williams*, 739 F.2d 936, 940 (3d Cir.1984); *see also Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We thus will affirm a conviction if it is supported by substantial evidence under which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Kapp*, 781 F.2d 1008, 1009 (3d Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986); *United States v. Dickens*, 695 F.2d 765, 779 (3d Cir.1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983). The evidence "does not need to be inconsistent with every conclusion save that of guilt," *United States v. Allard*, 240 F.2d 840, 841 (3d Cir.), *cert. denied*, 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957), to sustain the jury's verdict, *id. Accord Williams*, 739 F.2d at 940 (noting that, to be upheld, a jury finding of guilt beyond a reasonable doubt must be supported by substantial evidence when viewed in the light most favorable to the government).

Here, however, the government claims our review is even more restricted. It says Barel waived the usual appellate review of his sufficiency objections by failing to renew his Rule 29 motion for judgment of acquittal at the close of all evidence. Barel did fail to renew his motion; however, such a failure did not completely waive his right to review on sufficiency grounds. We may still reverse if we determine the evidence presented was so insufficient that for us to uphold his conviction would result in a miscarriage of justice or be fundamentally wrong. *See United States v. Wright–Barker*, 784 F.2d 161, 170–71 (3d Cir.1986); *see also* Fed.R.Crim.P. 52(b) (preserving appellate review to prevent "[p]lain error or defects affecting substantial rights"); *United States v. Santos*, 932 F.2d 244, 250 (3d Cir.1991) (explaining the plain error

rule); *United States v. Manos*, 340 F.2d 534, 537 (3d Cir.1965) (same).

We exercise plenary review over the district court's rulings on statutory construction. *See United States v. Preston*, 910 F.2d 81, 84 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1002, 112 L.Ed.2d 1085 (1991). These rulings include the district court's holding that § 1005 can be applied to someone who is not an insider at a bank and its holding that § 408(g) prohibited Barel's conduct. Our review of the jury's verdict for an alleged fatal ambiguity under *United States v. Dansker*, 537 F.2d 40 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) is plenary, *see United States v. Boffa*, 688 F.2d 919, 933 (3d Cir.1981) (treating question of verdict ambiguity as issue of law), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983), but we determine the existence of ambiguity on the basis of the evidence presented to the jury, resolving all conflicts in favor of the government and giving it the benefit of all inferences. We review any jury instruction designed to insure unanimity for abuse of discretion. *See United States v. Beros*, 833 F.2d 455, 458 n. 3 (3d Cir.1987). Finally, since the government agrees for purposes of this appeal that Barel should have been sentenced under the more lenient guidelines in effect at the time these crimes were alleged to have occurred, we need not discuss the standard of review of the sentencing issue Barel raises on appeal.

## VI.

With this background in mind, we pass to a more detailed consideration of the merits of Barel's issues. We begin with his argument on the construction of 42 U.S.C.A. § 408(g). Barel concedes, in his brief on appeal, that 42 U.S.C.A. § 408(g) outlaws the use of a false social security number with the intent to deceive the government. *See* Brief for Appellant at 36–37. Barel also concedes that § 408(g) prohibits the use of a false social security number in a private transaction where the user of the false number sought or received something

of pecuniary value. *See* Brief for Appellant at 38–39. However, Barel argues that we must reverse his conviction because substantial evidence does not exist to support either the proposition that he used Steven Katz's social security number with the intent to deceive the government or that he used the number to obtain, or in fact received, anything of pecuniary value.

Barel recognizes that the present version of 42 U.S.C.A. § 408(g), on its face, might seem to proscribe his actions but argues literal application would give the statute a much broader scope than Congress intended. He styles his misuse of Steven Katz's social security number as a transaction between private parties in which he neither sought nor received pecuniary gain. Building on this definition, he points out that neither he nor the government has been able to find a single case in which § 408(g) was invoked to reach the use of a false social security number in the circumstances peculiar to this case. Since criminal statutes should be read narrowly, he says his convictions on the social security offense cannot be sustained without proof of his intent to deceive the government or, at least, intent to secure pecuniary gain from the banks themselves.

From these premises, he goes on to argue that there is insufficient evidence to support a finding that he intended to deceive the United States and so, even if the evidence supports a finding of pecuniary gain, his social security offense convictions cannot stand under *Dansker* because the district court did not require a special verdict to show if the jury based its determination of guilt on the unsupported theory of intentional deceit of the United States or the theory of intentional deceit of the banks that the evidence does support.

■ Based on the language of the statute and its legislative history, we conclude that Congress intended § 408(g) to apply to the use of false social security numbers under the circumstances presented here. The government did not need to prove pecuniary gain in order to achieve a valid conviction.[5] Furthermore, we reject Barel's contention that the verdict was fatally ambiguous. If any juror voted to convict upon the finding that Barel deceived the government, that juror had to make the predicate finding that Barel deceived the banks. Thus, the jury had to be unanimous in its finding that Barel deceived the banks. Barel concedes that sufficient evidence was presented to permit a rational jury to find that he intended to deceive the banks when he gave a false social security number to them. We will thus affirm Barel's conviction on the social security charges. A more detailed analysis follows.

### A.

#### 1.

Barel insists the government had the obligation to link his deceptive use of the social security numbers to attempted or actual pecuniary gain. To reach this conclusion he takes two logical leaps. First, he reads the statute to proscribe use of a false social security number only for the purpose of obtaining something of "value." He then limits the definition of "value" to pecuniary gain.

■ Barel styles his own use of the false social security number as a transaction between private parties in which he did not seek pecuniary gain. As a result, he argues that his convictions for use of a false social security number cannot stand. We reject this argument for two reasons. First, it fails at once on the facts. The record shows Barel used the false number to gain something of pecuniary value. He sought to avoid support payments. Avoiding payments of support to his wife and children certainly had pecuniary value to him. His acts therefore fall within even his restricted definition and are covered by the statutory proscription against deceptive use of a social security number "for the purpose of obtaining anything of value from any person." 42 U.S.C.A. § 408(g).

---

5. In connection with the social security charges this conclusion makes it unnecessary for us to consider the government's argument that Barel waived his right to review for sufficiency when he failed to renew his Rule 29 motion for acquittal at the close of all evidence.

Had Barel's deception been successful, he would have been spared the cost of payments he was otherwise obliged to make. Therefore, we cannot characterize his use of Steven Katz's social security card as "a transaction between private parties" in which a defendant "neither obtains, nor intends to obtain, anything of pecuniary value by use of the false number." Brief for Appellant at 33.

■ Moreover, nothing in the legislative history of § 408(g) indicates that use of a false social security card for private purposes is excused if no money or thing of value is involved. The statute reaches misuse "for *any* ... purpose." 42 U.S.C.A. § 408(g) (emphasis added). This proscription was added to the statute in 1976.

Section 408(g) was first adopted in 1972. The original version was meant to protect the integrity of the Social Security program by forbidding the use of a fraudulent number to illicitly obtain or increase one's federal benefits. *See* H.R.Conf.Rep. 1605, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 5370, 5373. The original statute read:

> Whoever ... for the purpose of obtaining (for himself or any other person) any payment or any other benefit to which he (or such other person) is not entitled ... with intent to deceive, falsely represents a number to be the social security account number assigned by the Secretary to him or to another person, when in fact such number is not the social security account number assigned by the Secretary to him or to such other person ... shall be guilty of a misdemeanor....

42 U.S.C. § 408(g)(2) (Supp. II 1973).

Congress soon found that social security numbers were being abused in other contexts, so a 1976 amendment added the clause "for any other purpose" to § 408(g) because "social security numbers should not be wrongfully used for any purpose," S.Rep. No. 938, 94th Cong., 2d Sess. 391, *reprinted in* 1976 U.S.Code Cong. & Admin.News 3439, 3820, including those purposes unrelated to benefit payments. The resulting statute read:

> Whoever ... for the purpose of obtaining (for himself or any other person) any payment or any other benefit to which he (or such other person) is not entitled, ... *or for any other purpose* ... with intent to deceive, falsely represents a number to be the social security account number assigned by the Secretary to him or to another person, when in fact such number is not the social security account number assigned by the Secretary to him or to such other person ... shall be guilty of a misdemeanor....

42 U.S.C. § 408(g)(2) (1976) (emphasis added). Barel bases his pecuniary value argument on the current version of the statute, which includes language added by the 97th Congress in a December 29, 1981 enactment. With that addition, the statute now reads:

> Whoever ... for the purpose of obtaining (for himself or any other person) any payment or any other benefit to which he (or such other person) is not entitled, *or for the purpose of obtaining anything of value from any person,* or for any other purpose ... with intent to deceive, falsely represents a number to be the social security account number assigned by the Secretary to him or to another person, when in fact such number is not the social security account number assigned by the Secretary to him or to such other person ... shall be guilty of a felony....

42 U.S.C.A. § 408(g)(2) (West 1983) (emphasis added). The legislative history accompanying the 1981 addition shows that the new language was meant to reach the sale of stolen or counterfeited social security cards. *See* H.R.Conf.Rep. No. 409, 97th Cong., 1st Sess. 15, *reprinted in* 1981 U.S. Code Cong. & Admin.News 2681, 2687–88. The additional language was not restrictive, and the 97th Congress recognized that "[c]riminal penalties [were already provided for] using someone else's social security number." *Id.* at 2687. The 1981 amendment left intact the phrase "for any other purpose" and kept it in the disjunctive, indicating that Congress did not intend to

limit the reach of the statute by its amendment.

■ Our Court has recently explained: [I]f the statutory language is clear and plain, a court must give it effect unless the legislative history is such that a literal reading "will produce a result demonstrably at odds with the intention of [the] drafters," [*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)], or in other words, "would thwart the obvious purposes of the ... statute." *Mansell v. Mansell*, 490 U.S. 581, 592, 109 S.Ct. 2023, 2030, 104 L.Ed.2d 675 (1989).

*Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907, 910 (3d Cir.1990). The statutory language "or any other purpose" is clear, and its literal interpretation is supported by the legislative history. It is not demonstrably at odds with it. Moreover, that interpretation is consistent with the prophylactic effect we believe Congress wanted § 408(g) to have. The use of social security numbers as badges of identity in a great range of transactions in our modern society is so widespread that Congress included false use for any reason within the scope of acts prohibited under § 408(g) during that section's evolution into its present version. Providing a false social security number to a bank for any purpose is proscribed by the statute. Barel's deceitful use of another's social security number to open a bank account is within the "any other purpose" clause. Accordingly, his argument that the statute does not apply to his use of Steven Katz's social security number is rejected.

2.

■ For the government to secure the convictions under § 408(g)(2) it must also prove that a false social security number was used "with intent to deceive." 42 U.S.C.A. § 408(g)(2). Thus, Barel contends that even if § 408(g) applies to what he describes as his effort to avoid paying support his convictions must be reversed because two theories of liability concerning his intent to deceive were presented to the jury, only one of these theories was supported by the evidence presented at trial

and it is not clear upon which theory the jury based its convictions. *See United States v. Dansker*, 537 F.2d at 51. The first theory was intentional deceit of the banks, the second intentional deceit of the United States government. Barel concedes that the theory of bank deceit was supported, but claims that the governmental deceit theory was not. Assuming, *arguendo*, that there was no independent evidence of Barel's intent to deceive the government, there was still no fatal ambiguity about the basis of the jury's verdict on the facts in this record. The assumed lack of independent evidence does not leave us to speculate whether the jury based its verdict on a factually supported theory or an unsupported one. The evidence did support the jury's conclusion that Barel intentionally deceived the banks, as Barel concedes. On this record, no juror could have found that Barel deceived the government without first finding that Barel deceived the banks. Thus, Barel's concession destroys his argument that the basis of the jury's verdict is fatally ambiguous.

*Dansker* requires reversal of the convictions if a jury is charged with alternate possible theories of liability, the verdict is general, and only one of the theories is supported by the evidence. The verdict can be sustained only if it is clear that the jury based its findings on the supported theory. *See* 537 F.2d. at 51. When alternate theories are charged, *Beros* also requires sufficient notice to the jurors of the need to unanimously premise a conviction on the same theory. *See* 833 F.2d at 462. Both *Dansker* and *Beros* are distinguishable from the present case. Accordingly, neither *Dansker* nor *Beros* compels reversal of the § 408(g) convictions.

In *Dansker*, several defendants were indicted for conspiracy to violate the Travel Act, 18 U.S.C.A. § 1952 (West Supp.1991), along with two substantive violations of that Act. The indictments centered on an attempted bribery of the mayor of Fort Lee and the actual bribery of the vice-chairman of the Fort Lee Parking Garage. The defendants' scheme was designed to influence construction of a shopping complex. The

conspiracy depended on an agreement to offer the bribes, while the substantive crimes depended on the offer and acceptance of those bribes. The vice-chairman was convicted of accepting a bribe, while the other defendants were convicted of both conspiring to and actually offering bribes to the aforementioned officials. All defendants appealed their convictions.

At trial, the jury was charged that a conspiracy conviction could be grounded on a finding that the defendants agreed to offer a bribe to either of the two officials. This Court determined that the evidence pertaining to bribery of the vice-chairman was insufficient to support the conspiracy convictions, but there was enough evidence to show attempted bribery of the Mayor. Because the jury had been presented with alternate theories of liability on the conspiracy charge and it was possible that the jury had rendered a verdict based on the unsupported theory, we reversed the conspiracy convictions and remanded for a new trial. We wrote:

> In the instant case, the possibility ... remains, albeit slim, that the jury found that the defendants engaged in a conspiracy to bribe [the vice-chairman] alone in spite of its guilty verdict on [the attempted bribery of the mayor]. As a result, the defendants' conspiracy convictions must be vacated....

*Dansker,* 537 F.2d at 51.

Barel's case differs from *Dansker* because Barel's jury was not presented with alternative theories of liability. The government at oral argument stated "deceiving the bank was a prerequisite to deceiving the United States" on this record. We agree. Any juror's determination that Barel deceived the government necessarily implies a determination that he deceived the bank. Put another way, we can say that the intent to deceive the banks is included in any finding of intent to deceive the government.

We recognize that there may be cases in which independent evidence to deceive the government is needed, because deceit of some entity, be it public or private, is necessary to achieve a valid conviction under § 408(g). For example, Barel could not be convicted under § 408(g) without direct, independent proof that the government was deceived if the employees who helped him to open his account in each of the various banks knew him and had knowledge that the social security number he gave under a contrived alias was false. There is no indication in this record, however, that Barel knew any of the employees who helped him to open the accounts in question or that they knew him.

■ The logical connection between the arguably unsupported intent to deceive the government and the plainly shown intent to deceive the banks also eliminates the issue of whether the district court's charge to the jury sufficiently indicated that a guilty verdict could only be returned on one theory or the other, not a combination of the two. *See Beros,* 833 F.2d at 460–63. In *Beros* we held:

> [J]ust as the sixth amendment requires jury unanimity in federal criminal cases on each delineated offense that it finds a defendant culpable, it must also require unanimity regarding the specific act or acts which constitutes that offense. Absent such certainty, the unanimity requirement would provide too little protection in too many instances.

*Id.* at 461 (citations omitted). Since a finding that Barel intentionally deceived the government included a finding of intentional deceit of the banks, there could likewise be no violation of the *Beros* requirement, because the jury was unanimous in finding that Barel had acted with intent to deceive the banks. The jury necessarily agreed that the banks were an object of Barel's deceit. Alternative theories were not presented, and special findings were not required.

Moreover, with respect to *Beros,* there was a specific unanimity instruction consistent with this Court's ruling in the *Beros* case that the jury must unanimously agree as to the object of the crime. The jury was instructed that:

> You may find that Mr. Barel did not intend to deceive the United States or a bank, you may find that Mr. Barel did

intend to deceive the United States, but all 12 of you must agree on that, and that's what that instruction means, or if you find that Mr. Barel did not intend to deceive the United States but intended to deceive a bank, once again, all 12 of you must agree.

So it can't be six for one and six for the other and say the Defendant is guilty. You must be unanimous as to whether it's a bank or the United States, and it can be neither.

App. at 410. Had alternative theories been present, this instruction would have satisfied the *Beros* requirements. We express no opinion on whether such a limiting instruction would also satisfy *Dansker*. It is for these reasons that we will affirm Barel's § 408(g) convictions.

### B.

■ Since we have determined that Barel's § 408(g) convictions should be affirmed, the government invites application of the concurrent sentence doctrine to avoid further proceedings. "Under that doctrine an appellate court may avoid the resolution of legal issues affecting less than all of the counts in an indictment where at least one count has been upheld and the sentences are concurrent." *United States v. Lampley*, 573 F.2d 783, 788 (3d Cir.1978) (citing *Hirabayashi v. United States*, 320 U.S. 81, 85, 63 S.Ct. 1375, 1378, 87 L.Ed. 1774 (1943)).

We will not accept the government's invitation. The Supreme Court has stated that the presence of a special assessment against a defendant shows that the defendant is not serving concurrent sentences, because "liability to pay [the] total depends on the validity of each of [the] convictions." *Ray v. United States*, 481 U.S. 736, 737, 107 S.Ct. 2093, 2094, 95 L.Ed.2d 693 (1987) (per curiam). The district court ordered Barel to pay a special assessment totalling $300.00. This total, like the assessment in *Ray*, is dependent on the validity of all of Barel's convictions, and therefore even if

the sentences on the different counts are the same as to the terms of confinement, they are not concurrent under *Ray*. The existence of the special assessments leads us to reject the government's invitation to apply the concurrent sentence doctrine. Indeed, as the special assessment statute, 18 U.S.C.A. § 3013(a)(2)(A) (West 1985), provides that an assessment is mandatory for each separate conviction, we think *Ray* has basically interred the concurrent doctrine. Accordingly, we will proceed to the merits of Barel's convictions for violation of 18 U.S.C.A. § 1005.

### C.

Section 1005 punishes the maker of a false entry in the books or reports of a federally insured bank. For the purposes of this appeal we are concerned with the third paragraph of the version of § 1005 enacted in 1948. This paragraph of § 1005 reads:

> Whoever makes any false entry in any book, report, or statement of [a federally insured] bank with intent to injure or defraud such bank ... or any individual person, or to deceive any officer of such bank....
>
> ....
>
> Shall be fined not more than $5,000.00 or imprisoned not more than 5 years, or both.

18 U.S.C.A. § 1005 (West 1976).[6]

Barel attacks the validity of his convictions under § 1005 in two ways. First, he suggests that the statute does not apply to bank customers such as himself. The government replies that the language of the statute does not preclude such application, and even if direct application of § 1005 is inappropriate, Barel's convictions can be sustained through application of the aiding and abetting provisions found in 18 U.S.C.A. § 2.

Second, Barel claims that the evidence presented by the government was insuffi-

---

**6.** Congress amended § 1005 on August 9, 1989, sometime after Barel's final transaction with the three banks. Therefore, the earlier version of

the statute applies. The present statute is more comprehensive and assigns a larger fine and a longer term of imprisonment.

cient to show all the elements of the crime § 1005 defines and that his § 1005 convictions must be reversed because at least one element of that offense—the insured status of the banks to which he gave false information—was not proved beyond a reasonable doubt. Had Barel renewed his Rule 29 motion for acquittal at the close of all evidence, this could present a determinative issue; but, he failed to do so. Thus, we review his convictions for the strictly limited purpose of determining whether the government's attempt to prove the banks were federally insured was so defective that it amounted to plain error or a fundamental miscarriage of justice. *See Wright–Barker*, 784 F.2d at 170–71.

The government did present some evidence to show that the banks were federally insured through the oral testimony of the FBI agent who investigated the case. While we are not impressed with the government's way of proving insured status, we do not perceive any plain error or fundamental injustice and so will not reverse Barel's § 1005 convictions on this ground. Whether this evidence, unobjected to, is "substantial" is not before us on this appeal.[7] Nevertheless, we do not believe Congress intended § 1005 to apply to individual bank customers, either directly or indirectly. We will therefore reverse Barel's convictions on the false entry charge. We discuss both issues, beginning with sufficiency.

### 1.

■ If, as Barel contends, the government did not present any evidence of the federally insured status of the three banks, his convictions under 18 U.S.C.A. § 1005 could not stand. Had he properly renewed his Rule 29 motion, we would evaluate the record to see if the government produced substantial evidence sufficient to prove this element of its case beyond a reasonable doubt. Such review is stricter than the test we apply when a motion for acquittal is not properly renewed at the close of all evidence. At trial, as the Supreme Court

wrote in *re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970), "the Due Process Clause protects the accused against convictions except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Upon appeal from denial of a motion for judgment of acquittal, we check to see if the verdict is supported by substantial evidence. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Here, our evaluation of sufficiency is limited to what the government calls plain error because Barel did not preserve his right to more rigorous review by renewing his Rule 29 motion for judgment of acquittal at the close of all evidence. *See* Fed.R. Crim.P. 52(b). We find the term "plain error" somewhat difficult to apply in the context of a sufficiency question. Alternately, we could frame the question as whether the government's method of proving the banks' federally insured status resulted in a fundamental miscarriage of justice. *See Santos*, 932 F.2d at 250–51; *Manos*, 340 F.2d at 537. It is in the context of this limited scope of review that we consider the evidence the investigating FBI agent gave concerning the banks' federal deposit insurance. He testified that the banks were federally insured without supporting documentation.

This context also makes it unnecessary to decide whether the cases the government cites for the proposition that testimonial evidence alone is sufficient to prove a bank's federally insured status are distinguishable. Among them is *United States v. McIntosh*, 463 F.2d 250 (3d Cir.1972) (per curiam) (determining testimonial evidence was sufficient to show federally insured status under the federal bank robbery statute). *McIntosh*, as well as the other cases cited by the government, involve the testimony of bank officials, whose knowledge of the federally insured status of their own banks is a more reliable basis upon which

---

**7.** We note that at one point the FBI agent said that he "thought" the banks were insured.

to find that the bank's insured status has been established than the opinions of law enforcement officers. In *McIntosh*, we upheld a conviction under the federal bank robbery statute because the assistant vice president/manager of the bank, who was custodian of the bank's charters, testified that the bank was federally insured on the date of the robbery. Since our scope of review renders it unnecessary for us to decide whether *McIntosh* is controlling on this record, we note merely that the testimony of a bank's records' custodian strikes us as a more substantial basis than the testimony of an FBI agent whose knowledge of the bank came from an investigation.

We likewise find it unnecessary to decide whether *United States v. Thomas*, 610 F.2d 1166 (3d Cir.1979) (per curiam), controls on this sufficiency issue. In *Thomas*, this Court upheld bank fraud convictions under 18 U.S.C.A. § 656 (West Supp.1991), the federal "[t]heft, embezzlement, or misapplication by bank officer or employee" statute. The jury in *Thomas* had been charged that it could convict if it found that the bank was a *national* bank. We allowed the convictions to stand without any proof of a bank's status as a "national" bank beyond the use of the word "national" in its name. *See Thomas*, 610 F.2d at 1171. The jury in Barel's case had to find the banks were insured by the *Federal Deposit Insurance Corporation*. Even though one of the banks' names contained the word "Federal," none of them contained any reference to the FDIC. Again, procedural default relieves us of the need to explore this precedent more fully.

At trial, the district court determined that the FBI agent's testimony, standing alone, was sufficient to permit a rational jury to find that the banks were federally insured at the time of Barel's criminal acts. The judge ruled that if "the 3rd Circuit tells me that evidence supplied by an F.B.I. agent who is assigned to investigate the case and makes the determination that they're F.D.I.C.-insured and testifies is insufficient, then I'll have to be bound in the future." App. at 320. We are satisfied that the investigating officer's testimony, standing alone, did not result in a miscarriage of justice or plain error. It does not leave us with the firm conviction that the jury's finding of this element of the § 1005 crime would work an injustice on Barel if his § 1005 convictions depended on it.

We are influenced in this determination by the fact that Barel's counsel did not object to the agent's testimony when it was elicited at trial. For example, Barel's attorney could have objected to this aspect of the agent's testimony under Article X of the Federal Rules of Evidence, which requires the proponent to introduce the original or an acceptable duplicate to prove the contents of a writing, such as a certificate of FDIC insurance. *See* Fed.R.Evid. 1002, 1003. Further, Barel fails to argue on appeal that the banks were not federally insured at the times of his offenses; he merely argues that the government did not prove this element beyond a reasonable doubt. Under these circumstances, we do not think that denying reversal on this ground would result in a miscarriage of justice. Weak as this evidence was, its presence on the record is, we think, enough to preclude reversal on the basis of plain error. We do think, though, that the government would be wise to consider other, clearer means of establishing the federally insured status of banks that it charges have suffered false entries. Direct proof should be readily and simply available. Its use would avoid any question of whether federally insured status was proved beyond a reasonable doubt.

We hold there was no plain error or miscarriage of justice in Barel's case by reason of the government's failure to present evidence of the banks' insured status beyond that supplied by the FBI agent.

2.

■ Next, we turn to the legal question of whether 18 U.S.C.A. § 1005 applies to an individual bank customer such as Barel, as opposed to a bank officer, employee or

other insider. *See, e.g., United States v. Krepps,* 605 F.2d 101 (3d Cir.1979) (affirming convictions of bank loan officer under § 1005 for an intentional material omission in bank's records). This question of statutory construction presents an issue of first impression for our Court. The precise language of the statute does not preclude application to bank customers. Still, unlike the situation with respect to the social security charges under § 408(g), we think this is one of those "rare cases [where] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. at 571, 102 S.Ct. at 3250; *see also Fidelity Consumer Discount Co.,* 898 F.2d at 910. The legislative history of § 1005 convinces us that this is an appropriate case for applying the ancient maxim that criminal statutes should be narrowly construed. Indeed, "[w]e have reserved some scope for adopting a restricted rather than a literal or usual meaning of [a statute's] words where acceptance of that meaning ... would thwart the obvious purpose of the statute." *Griffin,* 458 U.S. at 571, 102 S.Ct. at 3250 (citations and internal quotations omitted). Since the legislative history of § 1005 shows that Congress intended the statute to apply only to bank insiders or their accomplices, we conclude that Barel is not subject to criminal liability under § 1005 for giving these banks false information about his social security number on the bank forms he filled out when he opened his accounts under the Katz alias. Our reasons follow.

The question of whether § 1005 can be directly applied to bank customers, when they are acting in an individual capacity, absent assistance from or cooperation with any bank employees, is not only a question of first impression for our Court, but the parties were unable to draw our attention to any other court of appeals ruling on this point. We are aware of only one situation in which a court of appeals reviewed the convictions of a bank customer under § 1005. *See United States v. Austin,* 585 F.2d 1271 (5th Cir.1978). Unfortunately, the facts in *Austin* bear little similarity to this case, and therefore *Austin* gives us only minimal guidance.

In *Austin,* the defendant, a bank customer, together with several of the bank's executives, worked to defraud the bank of more than $750,000.00 through a scheme involving the cashing of overdrafts. *Id.* at 1272. Austin wrote the checks and his co-defendants approved them for cashing. FDIC investigators discovered their scheme, and the defendants were all charged with various crimes including violation of 18 U.S.C.A. § 1005. *See Austin,* 585 F.2d at 1272. When Austin appealed his convictions, the Fifth Circuit affirmed the district court's holding without reference to the distinction between customer and insider. In *Austin,* the court was concerned with the level of participation between the various co-defendants in acting to defraud the bank. *Id.* at 1273–78. Furthermore, Austin conceded the § 1005 "false entry" issue. *See id.* at 1273–74 (stating that "[a]t the outset we observe that Austin concedes that ... entries were made in the Bank's records that prevented the FDIC examiners from discerning that his account was overdrawn"). Thus, in *Austin,* the court did not have to address directly the question we face today.

Barel's case is closer to *United States v. Edwards,* 566 F.Supp. 1219 (D.Conn.1983), than to *Austin.* In *Edwards,* a bank teller, acting outside her banking capacity, was charged with five counts of false entry in violation of the third paragraph of § 1005. This is the same paragraph of § 1005 that Barel was charged with having violated. In *Edwards,* the indictments were based on Edwards' intentional deposit of five insufficiently funded checks. The district court granted her motion to dismiss because "that ... section of 18 U.S.C. § 1005, which [Edwards] is accused of violating should be construed as applying only to actions committed by bank officers, di-

rectors, agents or employees and only to those actions of such individuals that are committed in connection with their role as bank employees." 566 F.Supp. at 1220.

In *Edwards*, the court, *inter alia*, considered the language of § 1005 and its predecessor, 12 U.S.C. §§ 592, 597 (1940), as well as the Supreme Court's analysis of a related statute, 18 U.S.C.A. § 1014 (West Supp.1991), in *Williams v. United States*, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982).[8]

The *Edwards* court first noted, as the government points out here, that the precise language of the statute could be read to apply to anyone, regardless of his connection to the banking institution in question. The court declined to adopt such a broad reading, but went on to examine the statute's history:

> [E]xamination of the statute's predecessor convinces this Court that such a broad application was never intended. Section 1005 is based on 12 U.S.C. §§ 592, 597 (1940). The earlier statute, which was separated into three sections by the 1948 revisions and codification of the criminal code, provided in pertinent part as follows:
>
> > "*Any officer, director, agent, or employee of any Federal reserve bank, or of any member bank ... who ...* without authority from the directors of such Federal reserve bank or member bank, issues or puts in circulation any of the notes of such Federal reserve bank, or who, without such authority, issues or puts forth any certificate of deposit, draws any order or bill of exchange, makes any acceptance, assigns any note, bond, draft, bill of exchange, mortgage, judgment, or decree, *or who makes any false entry in any book, report, or statement of such Federal reserve bank or member bank, with intent in any case to injure or defraud such Federal reserve bank or member bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such Federal reserve bank or member bank, or the Comptroller of the Currency, or any agent or examiner appointed to examine the affairs of such Federal reserve bank or member bank or the Federal Reserve Board ...* shall be fined not more than $5,000 or shall be imprisoned for not more than five years, or both, in the discretion of the court."

40 Stat. 972, § 5209, 65 Cong.Sess. II, Ch. 177 (1918) (emphasis added; script portion identifies what is now ¶ 3 of the present § 1005).

*Edwards*, 566 F.Supp. at 1220–21 (footnotes and citations omitted). The court determined that:

> It is clear that all three of the pre–1948 revision statute's prohibitions, currently set forth in separate paragraphs in 18 U.S.C. § 1005, applied only to "officer[s], director[s], agent[s], or employee[s]" of the protected banks. The Reviser's Note to § 1005 specifically states that "no changes of meaning or substance were made except that ... the different punishment provisions were reconciled, and one uniform punishment provision was adopted." 18 U.S.C.A. § 1005, "Historical and Revision Notes"; *see also* Reviser's Note under 18 U.S.C.A. § 656. Thus, if the substance of the present § 1005 was to comport with that of its predecessor statute, then the third paragraph of § 1005 must be construed as applying only to bank officers, directors, agents, or employees, and not to the public at large or customers otherwise unconnected to the protected bank.

F.Supp. at 1219. Except for the "employed" language, this charge mirrors the § 1005 charges against Barel. That distinction, if material, would seem to work against the government and for Barel.

---

**8.** Edwards was accused of "making and causing to be made false entries in her statement of accounts at the bank which employed her, which conduct is assertedly proscribed by the third paragraph of § 1005." *Edwards*, 566

*Edwards*, 566 F.Supp. at 1221 (footnotes and citations omitted). *Edwards* distinguished *Austin* because Edwards was "not charged with either making false entries herself or with causing those entries to be made *in her role as a bank employee.*" *Id.* at 1222 (emphasis in original). It also noted that "[t]he Government has cited no case, nor has the Court found any, in which § 1005 has been construed as applying to any persons other than bank officers, directors, agents, or employees whose criminal conduct was made possible or at least facilitated in some significant manner by their bank-roles." *Id.* at 1221 (emphasis in original). *Edwards'* analysis of the legislative and statutory history of § 1005 and its conclusion that Congress intended the statute to proscribe only the activities of bank insiders is otherwise supported. As the court went on to reason, too broad an interpretation of § 1005 would turn it into a federal "bad check" statute. *See id.* at 1222.

The court in *Edwards* noted that the Supreme Court raised this concern in an analogous situation in *Williams*, 458 U.S. at 279, 102 S.Ct. at 3088. *Williams* considered the application of 18 U.S.C.A. § 1014 to a bank official who abused the checking account privileges offered by the bank he presided over. After he had cashed a substantial number of worthless checks, bank examiners discovered his activities. He was then indicted, *inter alia,* for violation of § 1014. Section 1014 is similar to § 1005, but focuses on false statements made in bank applications to influence the actions of a federally insured bank. The Supreme Court held that the writing of a worthless check did not constitute a false statement for the purposes of § 1014. The Court specifically condemned such application of the statute as an impermissible extension of its scope. "[T]he Government's interpretation of § 1014 would make a surprisingly broad range of

unremarkable conduct a violation of federal law." *Williams*, 458 U.S. at 286, 102 S.Ct. at 3092.

We think a similar problem would arise if we adopted the government's broad interpretation of § 1005. It would enable the government to use § 1005 to prosecute for tax avoidance, social security abuse and other related criminal fraud offenses already specifically prohibited by other sections of the United States Code. Various sections of the Internal Revenue Code already specifically cover tax evasion offenses. As this case shows, Barel's conduct is also covered by § 408(g)'s proscriptions against use of a false social security card, to say nothing of other federal and state criminal fraud sections. *See, e.g.*, 18 U.S.C.A. § 1014 (West Supp.1991) (proscribing statements to influence action of FDIC-insured bank). Such specific prohibitions in other parts of the criminal code also indicate to us that an interpretation of § 1005 narrower than the one the government proposes is in order. Accordingly, we hold that § 1005 does not apply to bank customers who, acting in their own personal interest, give false information to the bank. Barel was unconnected to these banks except through the accounts he opened with a false social security number. Therefore, his actions do not come directly within § 1005.

That conclusion, however, does not put Barel's § 1005 false entry problems to rest. We must still consider whether he incurred criminal responsibility as an aider and abettor of the conduct § 1005 proscribes because he intentionally caused the bank employees, to whom he gave the false identification, to make false entries in bank records.

3.

Thus, we turn to consider if Barel, lacking legal capacity to violate § 1005 directly, can still be liable under 18 U.S.C.A. § 2 for aiding and abetting a false entry by caus-

ing a bank employee to make false entries in the bank's records.[9]

The government says Barel can be liable under § 1005, even though no criminal accomplice was involved in his acts. It relies on the rationale we used in *United States v. American Investors of Pittsburgh, Inc.,* 879 F.2d 1087, 1090 (3d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 368, 107 L.Ed.2d 354 (1989), to support application of 18 U.S.C.A. § 2(b) to the perpetrators of a money laundering scheme. These perpetrators lacked capacity to commit the proscribed substantive crime, but they caused innocent bank employees to do the prohibited acts.

◼ In *American Investors,* we upheld the convictions of various members of a securities investment firm for violating the pre–1986 version of the Currency Transactions Reporting Act (Reporting Act), 31 U.S.C.A. §§ 5313(a), 5322 (West 1983). The investment advisors structured their cash transactions at a Pittsburgh bank so that the bank would not file currency reporting notices pursuant to its statutory duty under the Reporting Act. 879 F.2d at 1091–93. We have held that § 1005 cannot be directly applied to a non-insider. Thus, *American Investors* poses the question of whether § 2(b) applies to Barel's actions, causing innocent bank employees to make the false entries § 1005 prohibits. We conclude that *American Investors* is distinguishable from Barel's case on several grounds, and therefore § 2(b) does not support affirmance of his § 1005 convictions.

In *American Investors,* the malfeasance of the investment advisors could not have been punished without use of § 2(b). We had to rely on § 2(b) to reach their actions because we had earlier, in *United States v. Mastronardo,* 849 F.2d 799 (3d Cir.1988),

determined that a bank customer had no reporting obligations under the Reporting Act or its accompanying regulations, and therefore a customer's act of structuring transactions to avoid the Act's $10,000.00 reporting level was not criminal. However, in *American Investors* we explained that the investment advisors intent went beyond mere structuring of their cash transactions to avoid reporting. They also intended, through that structuring, to cause the bank to fail to file the required reports, and they successfully accomplished that intent and purpose through their structuring scheme. Here, the evidence presented at trial did not show that Barel specifically intended anything more than to deceive his wife, which does not constitute a federal offense in and of itself.

Barel, unlike the investment advisors in *American Investors,* lacked any specific intent to violate federal law. His acts causing bank employees to make false entries in the bank's books, although intentional in the general sense of the word, were merely a byproduct of his specific intent to defraud his wife. The investment advisors, on the contrary, "willfully caus[ed] a financial institution to fail in its statutory duty." *American Investors,* 879 F.2d at 1090. In applying § 2(b) to sustain the convictions under the Reporting Act, *American Investors* focused on the specific intent of the investment advisors to cause the bank to violate the Reporting Act. Barel's willingness to deceive the bank and the government was ancillary to his purpose of avoiding payments to his wife. The government did not produce any evidence to show Barel intended to cause the bank to breach a statutory duty, nor did it show that any statutory duty went unperformed as a result of his actions. Evidence supporting the charge that he

---

9. The superseding indictment in this case did not indicate which subsection of 18 U.S.C.A. § 2 applied. The government's appellate brief indicates that application of § 2(b) is at issue. Barel does not refute that statement, and we will accept it for the purpose of analysis.

specifically intended to avoid tax payments was not produced until the sentencing hearing. Such evidence can receive no consideration in evaluating his convictions under § 1005.

Moreover, Barel did not "manipulate[ ] another to commit a crime." *American Investors*, 879 F.2d at 1094. In *American Investors*, we applied § 2(b) to a defendant who, "although lacking in criminal capacity himself, manipulates another to commit a crime." *Id.*

The Reporting Act we considered in *American Investors* was meant to allow monitoring of large cash transactions to facilitate criminal and other governmental investigations. *See* 31 U.S.C.A. § 5311 (West 1983) (reproducing the congressional declaration of purpose for the monitoring statutes). By causing the bank to avoid reporting, the purpose of the reporting statute was intentionally undermined. Since the government did not make a showing of any specific intent to cause a bank to fail in a statutory duty, Barel's acts did not undermine § 1005's statutory purpose.

### D.

Finally, Barel objects to the district court's use of the sentencing guidelines' loss table in effect at the time of sentencing rather than the table in effect at the time of the offense. He correctly points out that use of the guidelines in effect at the time of his sentencing resulted in an imprisonment range of 27 to 33 months, instead of 21 to 27 months under the earlier guidelines. Barel asks us to remand the case to the district court for application of the earlier guidelines and in support advances several arguments that touch upon the constitutional prohibition against ex post facto laws. *See* U.S. Const. art. I, § 9, cl. 3.

We need not address his arguments in favor of resentencing because the government has told us that it has no objection to use of the guidelines in effect at the time of the offense. The government assures us it is the "policy of the Department of Justice that the older guideline should be used if application of the newer guideline would increase the defendant's guideline sentence." Brief for United States at 25. Although the government's willingness to use the earlier, more lenient guidelines does not concede the validity of Barel's arguments, we find it unnecessary to consider the constitutional problems he raises because the government's binding representation that the guidelines in force at the time of Barel's offense can be used on remand, in resentencing, insulates Barel against any possible prejudice.

Therefore, on remand we will simply instruct the district court to apply the guidelines in effect at the time these crimes were committed and recalculate accordingly appropriate sentences for Barel's convictions on the social security charges.

### VII.

For the reasons stated above, Barel's convictions on charges of having violated 42 U.S.C.A. § 408(g) will be affirmed, but his convictions for having violated 18 U.S.C.A. § 1005 will be reversed. Accordingly, the district court's sentencing order will be vacated and the case will be remanded to the district court for resentencing on Barel's § 408(g) convictions under the guidelines in effect at the time he committed that offense.