United States Court of Appeals

FOR THE EIGHTH CIRCUIT

_____

No. 96-2326

_____

United States of America,      *
                               *
          Appellee,            *
                               *
     v.                        *
                               *
Darrell Dean Van Brocklin,     *
                               *
          Appellant.           *


_____                    Appeals from the United States
                               District Court for the
No. 96-2327                    District of South Dakota.

_____

United States of America,      *
                               *
          Appellee,            *
                               *
     v.                        *
                               *
Travis Edward Atterberry,      *
                               *
          Appellant.           *


_____

No. 96-2328

_____

United States of America,      *
                               *
          Appellee,            *
                               *
     v.                        *
                               *
Lawrence Kermit Pyatt,         *
                               *
          Appellant.           *


_____

No. 96-2329

_____

United States of America,    *
                             *
        Appellee,            *
                             *
    v.                       *
                             *
Susan Kay Hastings,          *
                             *
        Appellant.           *
                   _____

                    Submitted: February 12, 1997

                     Filed: June 6, 1997
                   _____

Before MAGILL, BEAM, and LOKEN, Circuit Judges.
                   _____

BEAM, Circuit Judge.


    Defendants were convicted on various counts arising from a
scheme to defraud a South Dakota bank. We affirm the convictions
of all defendants. We conclude, however, that the district court
erred in sentencing defendants Van Brocklin, Pyatt, and Atterberry.
We also vacate the district court's forfeiture order regarding
defendant Hastings, and remand for new findings regarding the
restitution order and the fine imposed on defendant Hastings.


**I.    BACKGROUND**


    We summarize the facts of this case in the light most
favorable to the verdicts. First Federal Savings Bank (First
Federal) is a now defunct bank that had its main office in Rapid
City, South Dakota. In 1989 the federal Office of Thrift
Supervision (OTS) audited the bank and determined that it had a

-2-

large capital deficit and inadequate management.  As a result, the bank entered into a consent agreement with OTS. Thereafter, First Federal was under the close supervision of OTS.

At the urging of OTS, First Federal hired defendant Darrell Van Brocklin as its president in 1989.  By 1991, however, it became clear that the bank would have to be sold.  Under the agency's direction, the bank took steps to increase its liquidity in order to be more attractive to potential buyers.  One of the bank's assets targeted for sale was a portfolio of real estate loans that it had purchased some years earlier.  These loans, known as the First Western Mortgage Corporation (FWMC) loans, were secured by commercial properties, mostly in California, and had at that time an aggregate outstanding principal balance of approximately $50 million.

Defendants Travis Atterberry and Lawrence Pyatt owned First National Funding (FNF), a Florida corporation that brokered loan sales.  In 1991, FNF began negotiating with a First Federal employee about purchasing the FWMC loans.  Beginning in November 1991, Van Brocklin personally continued the discussions with Atterberry and Pyatt.  In December 1991, FNF offered, subject to OTS approval, to purchase the FWMC loans for a price of "81 cents," that is, 81% of the loans' aggregate principal value.

Van Brocklin sent a letter accepting the offer, but did not notify the bank's board of directors of the proposed deal.  At a board meeting on December 17, Van Brocklin informed the board that some Florida buyers were interested in purchasing the loans for about 80 cents, but not that he had previously accepted FNF's 81 cent offer.  The matter rested until mid-January of 1992, when Van Brocklin asked John Jones, an employee of the Resolution Trust

Corporation (RTC), to evaluate the FWMC loans and give an opinion whether an 81 cent offer would be a good deal for the bank.[1]  After reviewing the loans, Jones told Van Brocklin on January 17, 1992, that this was a good price, since the RTC would expect to charge a purchaser approximately 70 cents if it were to sell the portfolio after assuming control of the bank.

On January 21, 1992, FNF made a new offer for the entire FWMC portfolio.  This time, FNF offered to purchase the loans for a price of 70 cents, or approximately $39 million.  Van Brocklin related this offer to William Hawthorne, the OTS agent supervising the bank, but did not inform Hawthorne of the earlier 81 cent offer.  Hawthorne approved the proposed sale at 70 cents.  On January 29, 1992, the bank's board of directors voted to accept the offer.

At the same meeting, the board also approved a second deal with FNF at Van Brocklin's recommendation.  This was for the sale to FNF of $8.3 million in "charged-off" loans.  The charged-off loans were approximately 1,200 unrelated loans that the bank had, at various times, determined were uncollectible or inadequately collateralized, and had reduced to a zero book value and written off as assets.[2]  As with the FWMC loans, OTS had been urging the bank to find a buyer for the charged-off loans.  The board agreed to sell the charged-off loans to FNF for a price of approximately $167,000--2% of the loans' aggregate principal.

---

[1]At that time, RTC was not supervising the bank, but was reviewing First Federal's assets in anticipation of the expected sale of the bank.

[2]Although these loans were no longer considered bank assets, at least some were still considered performing loans, in that the borrowers continued to make payments to the bank.

During the meeting, Van Brocklin also informed the board that he had received an offer of employment from FNF, and for that reason would not vote on the loan sales. Van Brocklin did not inform the board, however, that FNF was negotiating a simultaneous resale of the FWMC loans, and that he would be receiving a share of FNF's profits from that transaction. On February 12, 1992, Van Brocklin signed an employment agreement with FNF. On February 17, while the loan sales were pending, Van Brocklin and FNF entered into another agreement. This agreement provided that Van Brocklin could form a South Dakota corporation also called First National Funding (FNF-SD), which would service the charged-off loans. Under this deal, FNF-SD would retain sixty percent of collections on the loans, with the remaining profits going to FNF. On February 14, 1992, Van Brocklin incorporated FNF-SD. The same day, Van Brocklin received from FNF a check for a $50,000 "signing bonus."

Defendant Susan Hastings was a senior vice-president of the bank and a member of the board of directors. It was Hastings who prepared FNF-SD's articles of incorporation for Van Brocklin. On the same day, Hastings also sent a check (postdated to February 18) to Pyatt and Atterberry for $71,010.31. This money was to represent an interest rate adjustment for overcharges made to the FWMC loans' borrowers. Van Brocklin, however, had instructed Pam Brekke, a bank employee, to calculate the adjustment based not on the entire portfolio, but for only certain loans representing less than half the value of the $50 million portfolio. Hastings sent this partial payment even though FNF's offer had been for the entire portfolio, and the board had agreed to sell FNF all of the FWMC loans at the 70 cent price. Atterberry and Pyatt deposited this check, but never passed the funds on to the institution that ultimately purchased the FWMC loans.

On February 18, 1992, Van Brocklin attended the first closing for the FWMC loan sales in California. At the closing, FNF purchased less than half of the loans. At the same closing, FNF immediately resold the loans to another loan broker for a price of 78 cents. The escrow agent conducting the closing issued a check to FNF for $1,343,138.75, representing most of its profit from the resale. The agent also issued a second check, made out to "First National Funding, Inc." for $230,000. This check went, however, to South Dakota, and was deposited in a bank account established for Van Brocklin's company FNF-SD. The same day, Hastings prepared checks, which were signed by Van Brocklin, transferring these funds to two other accounts.

On February 20, 1992, Van Brocklin reported to the bank's board that FNF had purchased some of the loans, but that closings on the rest of the portfolio were expected by the end of the month. Van Brocklin also announced that he had signed an employment contract with FNF. Neither Van Brocklin nor Hastings informed the board that Van Brocklin had already received the $50,000 "signing bonus" and $230,000 from the first closing, nor that they had incorporated FNF-SD to service the charged-off loans.

There were two more closings for the FWMC loans. In meetings on February 28 and March 2, 1992, FNF purchased three loans for 70 cents, then immediately resold them for 91.4 cents. Van Brocklin represented First Federal at the closing, although by now he had entered into an employment agreement with FNF, and had received $280,000 from FNF. From this sale, Atterberry and Pyatt received $386,059.10. On March 6, the last closing took place. Pam Brekke represented the bank at the closing. FNF bought five loans with an aggregate principal value of approximately $10 million, again at the 70 cent price, and immediately resold them for 91.4 cents.

From this sale, the escrow agent wired $1,362,142.92 to FNF in Florida.  Much as in the first closing, the agent issued to "First National Funding, Inc.," an additional check for $750,000.  Atterberry gave Brekke an envelope containing this check and instructed her to give it to Van Brocklin.

The next day, a Saturday with the bank closed, Brekke met Van Brocklin and Hastings at the bank and delivered the envelope to Van Brocklin.  The following Monday, Hastings deposited this check in FNF-SD's account, then immediately prepared checks that transferred the money to a variety of accounts, investment funds, and to Van Brocklin's personal account.  In the end, First Federal realized about $22 million from the FWMC loan sales, even though FNF had agreed to buy the entire portfolio for approximately $39 million.  Pyatt's and Atterberry's profit from FNF's simultaneous resale of the loans at the three closings totaled more than $3 million.  Van Brocklin received $980,000.

Meanwhile, the charged-off loans began to pay off handsomely.  Three loans involved commercial properties in Minnesota known as the HDA properties, which had been in receivership.  The receiver had been holding $97,000 in rental payments from the properties and seeking instruction from Van Brocklin and Brekke on how to dispose of those funds.  Shortly after the sale of the charged-off loans, Van Brocklin directed Brekke to instruct the receiver to release those funds.  The receiver issued a check for these funds to First Federal.  Brekke instructed another bank employee to endorse the check to First National Funding, and Hastings then deposited the check in FNF-SD's account.

Furthermore, for some time prior to the loan sale, First Federal had been the plaintiff in a lawsuit involving the HDA

properties.  In November of 1991, Van Brocklin had taken part in settlement negotiations on behalf of the bank and had made a settlement demand of $1 million.  Van Brocklin did not, however, inform the board or OTS that a settlement was possible when the board voted to approve charging off the HDA loans in January 1992.  Late in 1992, the suit settled, resulting in payments to FNF-SD totaling $700,000, which Van Brocklin split with Atterberry and Pyatt.  Atterberry, Pyatt, and Van Brocklin also received substantial profits from certain other charged-off loans, most of which--including the HDA loans--were charged-off by bank employees at Van Brocklin's direction days before the sale to FNF.  By the end of 1992, the charged-off loans purchased for $167,000 that same February had produced more than $1 million.

OTS began investigating these transactions in April 1992, after bank employees reported that Van Brocklin, Hastings, and Brekke were working for FNF-SD, and indeed maintaining an office for FNF-SD, while still employed by First Federal.  The government issued a thirty-three count superseding indictment on April 13, 1995.  The government alleged that Pyatt and Atterberry bribed Van Brocklin in order to allow them to "cherry-pick" the most desirable of the FWMC loans at the 70 cent price, rather than purchasing the entire portfolio, thus defrauding the bank.  The government also alleged that part of the fraud was the addition to the charged-off loans shortly before their sale of a number of loans that Van Brocklin knew, but did not disclose, to be of substantial value.  Defendants then attempted to conceal the fraud by laundering the proceeds.

Following a twenty-one day trial, Van Brocklin was convicted of one count of bank fraud (18 U.S.C. § 1344), three counts of bribery (18 U.S.C. § 215), one count of engaging in fraudulent bank

transactions (18 U.S.C. § 1005), ten counts of engaging in a monetary transaction with unlawfully derived funds (18 U.S.C. § 1957), and two counts of money laundering (18 U.S.C. § 1956). Hastings was convicted of one count of bank fraud, seven counts of engaging in a monetary transaction with unlawfully derived funds, and two counts of money laundering. Pyatt and Atterberry were each convicted of one count of bank fraud, three counts of bribery, one count of engaging in fraudulent bank transactions, and ten counts of engaging in monetary transactions with unlawfully derived funds.[3] After a hearing, the district court entered forfeiture judgments against all defendants. Van Brocklin was sentenced to 108 months of imprisonment, a $150,000 fine, and $1,395,000 of restitution. Hastings received 51 months of imprisonment, a $10,000 fine, and a $250,000 restitution order. Pyatt and Atterberry each received 57 months of imprisonment, fines of $75,000, and $1,051,000 in restitution.

On appeal, the defendants' allegations include that the government withheld material evidence from the defense; that the district court erroneously instructed the jury; that the evidence was insufficient for conviction on various charges; and that the district court erroneously calculated their sentences.

_____

[3]Hastings was acquitted of one count of money laundering. The district court dismissed without prejudice Count IX, which charged Van Brocklin and Atterberry of conducting a continuing financial crimes enterprise, 11 U.S.C. § 225.

## II. DISCUSSION

### A. Withholding of Material Evidence

Defendants claim that the government withheld documentary evidence material to the issue of their guilt, violating <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). Under <u>Brady</u>, the government's suppression of material, exculpatory evidence violates due process. <u>Id.</u> at 87. To establish a <u>Brady</u> violation, a defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material. <u>United States v. Willis</u>, 89 F.3d 1371, 1381 (8th Cir. 1996). Evidence is "material" for <u>Brady</u> purposes if its cumulative effect would be to undermine confidence in the verdict. <u>Kyles v. Whitley</u>, 115 S. Ct. 1555, 1566 (1995). Impeachment evidence may also come within <u>Brady</u>. <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). Prior to trial, defendants made a variety of motions seeking to compel production of certain materials, and unsuccessfully moved to dismiss the indictments for the government's alleged failures to produce evidence.

The government admits that it refused to produce one of these documents: the personnel file of William Hawthorne, the OTS agent who supervised the bank. The government maintains, however, that it withheld the file only after it had examined the file and determined that it contained no <u>Brady</u> material. It is the prosecutor's duty to examine documents to determine whether they contain <u>Brady</u> material. <u>United States v. Pou</u>, 953 F.2d 363, 366 (8th Cir. 1992). Despite the government's representations, defendants assert that the file may have contained impeaching information or evidence of OTS's knowledge of the events in question. Mere speculation that materials may contain exculpatory

-10-

evidence is not, however, sufficient to sustain a <u>Brady</u> claim. <u>United States v. Agurs</u>, 427 U.S. 97, 109-10 (1976). Furthermore, when the government has reviewed a personnel file for <u>Brady</u> material, the defendant's speculation that the file may contain impeaching information does not compel the district court to review the file <u>in camera</u>. <u>Pou</u>, 953 F.2d at 367. Here, the district court's denial of the defendants' motion to compel production of Hawthorne's file was essentially a discovery ruling, and absent a colorable showing that the file in fact contained <u>Brady</u> material or that the government acted in bad faith, the district court did not abuse its discretion in denying the motion. <u>See</u> <u>Willis</u>, 89 F.3d at 1381 n.6.

Other documents in dispute include an RTC asset valuation review (AVR) of the FWMC loans prepared by RTC agent Jones, various materials regarding the FWMC loans, agency investigative notes and telephone logs, correspondence, and other records. Defendants assert that these documents would have been material in impeaching government witnesses, in demonstrating that OTS and RTC were fully aware of the transactions in issue, and in demonstrating that the sale of the FWMC loans and the charged-off loans was proper. The government contends that it made available all material that was in its possession or controlled by OTS and RTC. There is evidence that at least some information the defense failed to find in the agency files did, in fact, exist at some point.[4] It is much less clear whether other requested documents, such as Van Brocklin's correspondence and agency files on the FWMC loans, were actually

---

[4]For example, RTC agent Jones testified that he conducted the asset valuation review of the FWMC loans and recounted his conclusions at trial. The written report of the AVR, however, was never produced (although a summary report was). In addition, OTS agent Hawthorne testified that he made numerous call reports of his telephone contacts with First Federal, but the government produced only seven such reports.

retained by the agencies.  The upshot is that, for much of the material sought by the defense, we face an impasse: the defendants say that exculpatory material was missing from the files it examined, while the government maintains that the defense had access to everything, and that any "missing" material simply does not exist.

This discrepancy is troubling, but it does not give rise to a <u>Brady</u> violation.  Defendants' belief that certain documents were missing from the files they examined does not, without more, establish that the government has actually suppressed those purported documents.  Even for those documents that probably did exist, the record does not indicate that the absence was due to the prosecution.  In determining whether a <u>Brady</u> violation has occurred when the government has lost or destroyed evidence, "courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."  <u>California v. Trombetta</u>, 467 U.S. 479, 486 (1984).  Here, our task is even more difficult, as we cannot be sure whether or not much of the material in dispute was ever in the government's possession.

Nevertheless, we have carefully reviewed the appellants' arguments for why the disputed material constituted <u>Brady</u> material.  Even if we were to accept defendants' representations of the content of the material they sought, and assume that the material was in fact retained by the government, we conclude that defendants have not shown that material was either favorable to the defense or that it was material in that its collective effect would undermine confidence in the verdicts.  We therefore hold that the defendants

have failed to establish any of the three elements that show a <u>Brady</u> violation.[5]

## B.  Jury Instructions

Defendants objected to a number of the district court's jury instructions, and renew their challenges on appeal.  We review the district court's formulation of the jury instructions for abuse of discretion.  <u>United States v. Kime</u>, 99 F.3d 870, 877 (8th Cir. 1996).  We uphold an instruction if it "fairly and adequately contains the law applicable to the case."  <u>United States v. Casas</u>, 999 F.2d 1225, 1230 (8th Cir. 1993).

### 1.  Instructions 17 and 23

All four defendants were convicted of one count of bank fraud under 18 U.S.C. § 1344.  Van Brocklin, Pyatt, and Atterberry were also convicted of engaging in fraudulent bank transactions under 18 U.S.C. § 1005.  Van Brocklin, Pyatt, and Hastings[6] assert that the district court's jury instructions on these counts impermissibly broadened the scope of the indictment, thus depriving them of their right to a grand jury indictment.  See <u>United States v. Neff</u>, 525

---

[5]Atterberry, Pyatt, and Hastings also argue that the government's alleged failure to produce evidence violates the Sixth Amendment's Compulsory Process Clause.  <u>See</u> <u>Washington v. Texas</u>, 388 U.S. 14, 18-19 (1967).  This argument is without merit. Compulsory process applies only to a defendant's right to produce witnesses and to offer witness testimony.  <u>Taylor v. Illinois</u>, 484 U.S. 400, 407-09 (1988); <u>Anderson v. Groose</u>, 106 F.3d 242, 246 (8th Cir. 1997).

[6]As with a number of other issues, defendant Atterberry neither argued this issue in his brief nor incorporated it by reference, and so appears to have waived this issue.  In light of our conclusions, however, this oversight does not prejudice Atterberry.

-13-

F.2d 361, 363 (8th Cir. 1975).  Defendants argue that the indictment alleged only that they defrauded the directors of the bank, whereas the applicable jury instructions, 17 and 23, stated that intent to defraud could be established by showing deception of the bank's "officers, directors and examiners."  Because the indictment did not mention officers or examiners, defendants argue, the jury instructions broadened the scope of the indictment.

We disagree.  Sections 1005 and 1344 require proof of fraud on the bank, but such fraud can be established by misrepresentations made to those groups delineated in the jury instructions. See United States v. Molinaro, 11 F.3d 853, 861 (9th Cir. 1993)(rejecting a similar challenge to a § 1344 conviction).  Instructions 17 and 23 do not allow conviction of these defendants on crimes or facts not charged in the indictment.  We therefore conclude that those instructions were not erroneous.

Furthermore, even if we were to accept the defendants' reading of the indictment, any error was harmless.  The instructions required the jury to find defendants deceived the bank's "officers, directors and examiners" (emphasis added).  The instructions thus required the jury to find intent to deceive the directors, which defendants allege is the sole fraud theory charged in the indictment.  Indeed, by being framed in the conjunctive, Instructions 17 and 23 arguably required a greater degree of proof than either the statutes or the indictment require.

## 2.  Instruction 25

Hastings and Pyatt challenge their convictions for engaging in monetary transactions with unlawfully derived funds, pursuant to 18 U.S.C. § 1957.  They claim that the applicable instruction, number

25, did not instruct the jury that conviction required proof of an effect on interstate commerce. They argue that "effect on interstate commerce" is an essential element of a § 1957 violation, and Instruction 25 allowed the jury to convict without finding such an effect.

Other circuits are split on whether "effect on interstate commerce" is an essential element of a § 1957 charge or simply a jurisdictional requirement. Compare United States v. Kelley, 929 F.2d 582, 586 (10th Cir. 1991) (holding that effect on interstate commerce is a jurisdictional requirement that need not be submitted to the jury), with United States v. Aramony, 88 F.3d 1369, 1387 (4th Cir. 1996) (holding it an essential element of the crime); see also United States v. Spriggs, 102 F.3d 1245, 1260 (D.C. Cir. 1996) (questioning Kelley). We need not enter this debate in this case. Instruction 25 required the jury to find a "monetary transaction," and then correctly defined "monetary transaction" as a transaction "in or affecting interstate or foreign commerce." Assuming the jury followed the instruction, it could not have found a monetary transaction without finding an effect on interstate commerce. Not only does Instruction 25 fairly and adequately contain the applicable law, but it tracks § 1957 nearly verbatim. The district court did not err in submitting Instruction 25 to the jury.

C.   **Denial of Judgment of Acquittal for Fraudulent Bank Transactions, 18 U.S.C. § 1005**

Count VIII of the indictment charged Van Brocklin, Atterberry, and Pyatt with violating the fourth paragraph of 18 U.S.C. § 1005, which provides:

Whoever with intent to defraud the United States or any agency thereof, or any financial institution referred to in this section, participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution--

Shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Pyatt and Atterberry moved for a judgment of acquittal on Count VIII, arguing that § 1005 applies only to bank officers, directors, agents, or employees. The district court denied the motion, and Pyatt appeals.

The first four paragraphs of § 1005 define four categories of fraudulent conduct that the statute criminalizes. The first paragraph states that "[w]hoever, being an officer, director, agent or employee of any [bank] without authority . . . issues or puts in circulation any notes of such bank" is liable. (emphasis added). The following three paragraphs (including paragraph four, under which defendants were charged) contain no such class restriction.

Pyatt argues that, despite the lack of a class restriction in the text of paragraph four, Congress' intent was to limit liability under § 1005 to bank insiders. Pyatt relies on United States v. Edwards, 566 F. Supp. 1219, 1221 (D. Conn. 1983), in which the court held that paragraph three, which also contains no class restriction, applies only to officers, directors, employees, and agents. In a case not cited by the parties, the Third Circuit reached a similar conclusion about paragraph three. United States v. Barel, 939 F.2d 26, 38-41 (3d Cir. 1991). The courts in Edwards and Barel reasoned that the predecessor statute to § 1005 limited criminal liability to bank insiders, and the legislative history suggested that Congress intended no substantive changes when it

-16-

amended and recodified the statute in 1948. <u>Barel</u>, 939 F.2d at 40-41; <u>Edwards</u>, 566 F. Supp. at 1220-21; <u>but cf.</u> <u>United States v. Edick</u>, 432 F.2d 350, 352-353 (4th Cir. 1970) (affirming conviction of non-insider because plain language of paragraph three contains no class restriction).

We need not decide whether the courts in <u>Edwards</u> and <u>Barel</u> correctly interpreted Congress' intent with regard to paragraph three, because paragraph four has a much different history than the rest of § 1005.  Congress added paragraph four to the statute in 1989 as part of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub. L. No. 101-73, 103 Stat. 183, 499, § 961(d)(3) (1989).  A response to the savings and loan disaster of the 1980s, FIRREA was intended, in part, "[t]o strengthen the enforcement powers of Federal regulators of depository institutions [and to] strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors."  <u>Id.</u> at § 101(9)-(10). FIRREA's legislative history notes the addition of paragraph four, but in no way indicates that liability under that provision is limited to bank insiders.  <u>See</u> H.R. Rep. No. 101-54(I), at 399-400, 472-73, <u>reprinted in</u> 1989 U.S.C.C.A.N. 195-96, 268-69.  The legislative history of the other provisions of § 1005 upon which <u>Edwards</u> and <u>Barel</u> relied is simply not applicable to paragraph four.

Paragraph four is not by its terms restricted to bank insiders.  Furthermore, the conduct that the paragraph criminalizes--participation in or receipt of funds derived from a bank transaction with the intent to defraud--clearly encompasses the kinds of acts charged in this case.  Nor is the described conduct the sort that, in most cases, would require insider status or access to bank records.  Given Congress' concerns in enacting FIRREA, we decline to read into paragraph four of § 1005 a class

restriction that Congress did not itself mention.  We hold that when a person "with intent to defraud . . . participates or shares in or receives" funds derived from a transaction with the bank, that person may be convicted under paragraph four of § 1005, regardless of whether he or she is a bank employee, officer, director, or agent.

### D.  Sufficiency of the Evidence

Defendants challenge the sufficiency of the evidence to convict them on a number of charges.  Our review of the sufficiency of evidence is narrow, viewing all evidence in the light most favorable to the verdict and affording the government the benefit of all reasonable inferences that can be drawn from the evidence.  United States v. Smith, 104 F.3d 145, 147 (8th Cir. 1997).  We must affirm if any interpretation of the evidence would allow a reasonable-minded jury to find the defendants guilty beyond a reasonable doubt.  Id.

### 1.  Fraudulent Bank Transactions

Pyatt challenges the evidence supporting his conviction for engaging in fraudulent bank transactions, in violation of 18 U.S.C. § 1005.  A defendant violates § 1005 if he or she "with intent to defraud . . . participates or shares in or receives (directly or indirectly) any money . . . through any transaction" with a financial institution.  The evidence showed that Pyatt and Atterberry received  more than $3 million in profit from the FWMC loan sales and a sizable share of the proceeds from FNF-SD's collections on the charged-off loans.  Van Brocklin received nearly $1 million in payments from these sales, and allowed FNF to purchase a portion of the FWMC portfolio when it was committed to

-18-

buying the entire package, enabling FNF to resell those loans at a substantial profit.  A reasonable jury could conclude that the defendants received money from the loan sales as part of an intent to defraud the bank, and we affirm this conviction.

### 2.  Bank Fraud

Hastings and Pyatt challenge their convictions for bank fraud, 18 U.S.C. § 1344.  To prove a violation of § 1344, the government must show that defendants "knowingly executed a scheme to defraud a federally insured bank." United States v. Britton, 9 F.3d 708, 709 (8th Cir. 1993).  Hastings and Pyatt argue that the evidence was insufficient to establish their knowing participation in fraud. Pyatt further argues that FNF's dealings with First Federal merely reflect bona fide transactions and "aggressive brokering."

The evidence showed that Pyatt and Atterberry covertly paid Van Brocklin more than a million dollars in three separate payments.  Pyatt and Atterberry then purchased less than half of the FWMC loans though they were obligated to purchase the entire portfolio, and then made immediate and substantial profits by reselling the loans.  Hastings, who was a high ranking bank officer, board member, and who worked closely with Van Brocklin, was aware of these payments.  She assisted in transferring the proceeds, sent FNF a check for over $71,000 that went directly to Pyatt and Atterberry, and did not disclose these dealings to the board or OTS.  Hastings was aware of the substantial profits from the charged-off loans, which Van Brocklin shared with Pyatt and Atterberry, assisted in processing those funds, and did this even while continuing to work for First Federal.  A reasonable jury could have inferred that Hastings and Pyatt knowingly engaged in a scheme to defraud the bank, and we affirm the convictions.

-19-

### 3. Bank Bribery

Pyatt challenges his convictions, under Counts II, III, and IV, for bank bribery, 18 U.S.C. § 215.[7] The basis of these charges was the $50,000 "signing bonus" to Van Brocklin and the two payments of $230,000 and $750,000 from the FWMC loan closings. Pyatt contends that the government failed to prove that the payments to Van Brocklin were anything other than bona fide compensation pursuant to his employment agreement with FNF. The evidence showed that Pyatt and Atterberry negotiated the loan transactions with Van Brocklin, and that their offer for the FWMC loans dropped from 81 cents to 70 cents after RTC agent Jones told Van Brocklin 70 cents was a fair price. Van Brocklin failed to inform either the bank directors or OTS of the 81 cent offer. Van Brocklin did not disclose the payments from FNF. The two checks to Van Brocklin from the FWMC loan proceeds were made out to "First National Funding, Inc." rather than to him, which the government argued indicated an attempt to conceal those payments. Van Brocklin allowed FNF to buy only a portion of the FWMC portfolio, and Pyatt and Atterberry obtained quick and sizeable profits from

---

[7]Section 215 imposes criminal liability on whomever:

(1) corruptly gives, offers, or promises anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution; or

(2) as an officer, director, employee, agent, or attorney of a financial institution, corruptly solicits or demands for the benefit of any person, or corruptly accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution.

18 U.S.C. § 215(a)(1) & (2). The statute thus criminalizes both making and receiving a bribe in connection with a bank transaction.

the transactions, which they shared with Van Brocklin. This evidence would allow a reasonable jury to agree with the government's theory that Pyatt and Atterberry paid Van Brocklin in exchange for allowing them to cherry-pick the FWMC loans. The convictions are affirmed.

### 4. Money Laundering/Monetary Transactions With Unlawfully Derived Funds

Van Brocklin, Hastings, and Pyatt challenge their convictions, on multiple counts, of money laundering, 18 U.S.C. § 1956, and engaging in monetary transactions with unlawfully derived funds, 18 U.S.C. § 1957. The elements of a § 1956 violation are: (1) the defendant conducted a financial transaction which involved the proceeds of unlawful activity; (2) defendant knew that the property involved in the transaction was the proceeds of specified unlawful activity; and (3) that defendant intended to promote the carrying on of specified unlawful activity. United States v. Williams, 87 F.3d 249, 254-55 (8th Cir. 1996). A conviction under § 1957 requires a showing that: (1) defendant knowingly engaged in a monetary transaction; (2) the defendant knew that the property involved derived from specified unlawful activity; and (3) the property is of a value greater than $10,000. See United States v. Hare, 49 F.3d 447, 451 (8th Cir 1995).

The § 1957 counts involved a number of deposits, payments, and transfers of the proceeds of the charged-off loans after the sale to FNF, the profits on the resale of the FWMC loans, and the $71,010.31 "interest adjustment" sent to FNF for the FWMC loans. Hastings's and Van Brocklin's § 1956 money laundering convictions stemmed from their deposit and immediate transfer of the two checks totaling $980,000 that Van Brocklin received from the FWMC loan sales, and which were the basis of the bribery convictions. In

-21-

light of the evidence already summarized, the jury could reasonably have found that these transactions met the elements set forth above.

As noted previously, defendants contend that an effect on interstate commerce is an essential element of these crimes, rather than simply a jurisdictional requirement.  If we assume, without deciding, that such an effect is an element of these crimes, there was nonetheless ample evidence to support these convictions.  The smallest of these transactions involved $14,000 and the largest $1,362,142.92.  Defendants' conduct involved a number of banks and individuals in three different states.  A reasonable jury could find that each of these transactions had an effect on interstate commerce.[8]

Finally, Defendants challenge the forfeiture judgments entered against them, on the basis that there was insufficient evidence for conviction on the predicate crimes.  Because we find the evidence sufficient for all of the convictions, we affirm the forfeiture judgments, except as otherwise discussed below.

---

[8]Hastings and Pyatt also argue that conviction required that the government prove that the transactions involved "financial institutions," which they claim is an essential element of these crimes.  Even if we were to agree with this premise, we find that the evidence clearly supported an affirmative jury finding in this regard.

**E.   Sentencing Issues**

   **1.   Enhancement for Loss**

   Van Brocklin, Atterberry, and Pyatt were sentenced under the sentencing guideline applicable to bank fraud.  U.S. Sentencing Guidelines Manual § 2F1.1.   The district court found that defendants' conduct caused a loss to First Federal of $3.892 million, resulting in a thirteen-level specific offense characteristic enhancement under § 2F1.1(b)(1)(N).  In determining the total loss, the district court considered the following sums: (1) the $980,000 that Van Brocklin received in bribe money from Atterberry and Pyatt; (2) FNF's profits from the FWMC loan sales; (3) the $97,000 released by the HDA property receiver; and (4) the settlement from the HDA litigation.  Defendants claim that the district court erroneously equated the bank's loss with the profit made by the defendants.   We review the district court's interpretation of the Guidelines de novo, and the factual findings supporting its conclusions for clear error.   United States v. Willis, 997 F.2d 407, 417 (8th Cir. 1993).

   A number of courts have held that, in some cases, it is inappropriate to determine loss under § 2F1.1 in accordance with the gain to the defendants.  See United States v. Kopp, 951 F.2d 521, 526-36 (3d Cir. 1991) (summarizing cases).  The guideline's application notes are ambiguous as to whether or when such a method is appropriate, stating that "loss need not be determined with precision.  The court need only make a reasonable estimate of the loss, given the available information. . . .  The offender's gain from committing the fraud is an alternative estimate that ordinarily will overestimate the loss."  U.S.S.G. § 2F1.1, comment. (n.8).

-23-

Given the wide latitude the guideline gives sentencing courts in determining loss, we are not prepared to say that determining loss according to a defendant's profit is necessarily erroneous, so long as the evidence indicates that such a method provides a reasonable estimate of the actual loss.[9]  We find that in this case, however, the district court clearly erred in equating "loss" solely with the defendants' profit.  The district court apparently found that the entire profit that FNF made from its resale of the FWMC loans was money that should have gone to First Federal, and was therefore "loss" to the bank.  The court also concluded that the $980,000 that Van Brocklin received from the FWMC sales, which was paid out of FNF's profit margin from those sales, also should have gone to the bank and was thus "loss."

The problem with this is that the government never established by a preponderance of the evidence what FNF would have or should have paid for those loans had the sales been legitimate.  In this case, both the bank directors and OTS wanted those loans sold. Any loss to the bank from defendants' scheme did not occur simply because the loans were sold, but only if the loans were sold at an artificially low price.  This was the very nature of the government's cherry-picking theory:  that FNF selectively purchased high-value loans from the FWMC portfolio, yet paid a 70 cent price that was based on the quality of the portfolio as a whole.

The government has the burden of proof in showing loss under § 2F1.1, and the evidence at trial and at sentencing simply did not

---

[9]In several of the cases summarized in Kopp, for example, the defendant had fraudulently obtained a loan, but then fully performed according to the terms of the loan.  In those cases, the amount of the loan would have greatly overestimated any actual loss to the bank.  Kopp, 951 F.2d at 531-33.  Those defendants' gains were thus not a reasonable estimate of actual loss.

establish with any certainty what that loss was.  Even if we were to assume that FNF, acting without fraud and bribery, would have paid a higher price to First Federal for the loans it cherry-picked, FNF presumably would still have resold those loans at a yet higher price in order to turn a profit.  Similarly, using the bribes paid to Van Brocklin as a proxy for loss is inappropriate, since those funds also came out of FNF's profit margin from the sales.  The evidence did not establish what First Federal should have received on those sales in a completely legitimate transaction.  Equating defendants' entire profit with "loss" to First Federal in all likelihood overestimates the actual loss to the bank.[10]  We therefore hold that the district court clearly erred in its determination of the bank's loss under § 2F1.1.  We remand to the district court for a new determination of loss to the bank under § 2F1.1 or for recalculation of the sentences under another appropriate guideline.

### 2.    Denial of Reduction for Mitigating Role for Hastings

Hastings's presentence report recommended that she receive a four-level reduction in her offense level as a "minimal participant" pursuant to U.S.S.G. § 3B1.2(a).  Hastings alternatively argued that she is entitled to at least a two-level reduction under § 3B1.2(b) as a "minor participant."  The district court declined to apply either reduction.  We review the district court's determination of § 3B1.2 adjustments for clear error. United States v. Field, 110 F.3d 587, 590 (8th Cir. 1997).

---

[10]Establishing loss is even more complicated in this case, because the government stipulated that 70 cents was a fair price for the FWMC loan portfolio.  Furthermore, the evidence that might most clearly establish the actual loss to the bank, the asset valuation review conducted by RTC agent John Jones, was one of the documents that defendants allege the government failed to produce.

A four-level reduction under § 3B1.2(a) is appropriate for defendants "who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, comment. (n.1). It is meant to be "used infrequently" and is "appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." Id. (n.2). Hastings's conduct in this case is not comparable to the infrequent situations contemplated by the guideline. Hastings was a high-ranking bank officer and a member of the board, knew of the scheme, and concealed Van Brocklin's conduct from the board and OTS. Hastings was present when Van Brocklin received $750,000 in bribe money and personally participated in transferring the funds that were the subject of her money laundering convictions. The court's denial of a four-level adjustment was not clearly erroneous.

Whether Hastings should have at least received a two-level reduction as a minor participant is a closer question. "For purposes of §3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.3). Hastings did not receive any direct share of the proceeds of the loan sales, and it is clear that Van Brocklin, Atterberry, and Pyatt were the masterminds of the deal. Given the facts described previously, however, we cannot conclude that the district court clearly erred in denying a two-level reduction.[11]

---

[11]We note that although the district court denied a reduction under § 3B1.2, the court did, in fact, reduce Hastings's total offense level from 26 to 24 "in the interest of proportionality." Sentencing Tr. at 167-68. The government did not appeal this reduction, which the district court recognized could not "be

Hastings also appeals the district court's denial of her motion for a downward departure. The record shows that the district court recognized that it had authority to depart downward, but refused to exercise its discretion to do so. Sentencing Tr. at 167. Such a discretionary refusal to grant a downward departure is not reviewable. United States v. McCarthy, 97 F.3d 1562, 1578 (8th Cir. 1996).

### 3. Hastings's Forfeiture, Restitution, and Fine

The district court entered a forfeiture judgment against Hastings for $1,325,910.60. Hastings argues that this forfeiture order violates the Excessive Fines Clause of the Eighth Amendment, and we agree.

Criminal forfeitures are monetary punishments subject to the Eighth Amendment's Excessive Fines Clause. Alexander v. United States, 509 U.S. 544, 558-59 (1993). Whether a forfeiture is "grossly disproportionate" and thus violates the Eighth Amendment is a fact-sensitive inquiry that depends on a number of factors. United States v. Alexander, 32 F.3d 1231, 1236 (8th Cir. 1994). These factors include, but are not limited to: the seriousness of the offense; an assessment of the personal benefit reaped by the particular defendant; the defendant's motive and culpability; and "the extent that the defendant's interest and the enterprise itself are tainted by criminal conduct." Id. at 1236-37 (quoting United States v. Sarbello, 985 F.2d 716, 724 (3d Cir. 1993)).

---

classified as a departure." Id. at 167. The district court was, in part, concerned that Hastings's calculated total offense level of 26 would be higher than that of Atterberry and Pyatt, and that this was unfair in light of Hastings's role in the crimes. Id. at 166-68. The district court appears to have, in effect, given Hastings the benefit of a § 3B.1.2 adjustment by another name.

While Hastings's convictions for money laundering and bank fraud constitute serious offenses, the facts of this case indicate that a $1.3 million forfeiture order is grossly disproportionate. Although Hastings abused her position of trust as a high-ranking bank official, she was clearly a secondary figure in the crimes. Furthermore, her motive appears to have been a misguided loyalty to Van Brocklin, rather than a direct interest in the success of the scheme. As the district court noted at sentencing, "Ms. Hastings' situation provides special difficulty for the Court in [that] much of her conduct was pressed upon her by Mr. Van Brocklin." Sentencing Tr. 164.[12] Hastings reaped little benefit: while the scheme earned Van Brocklin, Atterberry, and Pyatt millions of dollars, Hastings received no direct share of the proceeds.[13] Despite this, Hastings's forfeiture judgment is only marginally less than Van Brocklin's.[14] In view of these facts, we hold that the forfeiture judgment against Hastings was an excessive fine.

The district court also entered a $250,000 restitution order against Hastings. In light of the facts described above, we are

---

[12]Even the prosecutor noted at sentencing that "It is really a difficult balance . . . regarding this defendant. [B]ut for her association with Van Brocklin, I don't believe she'd be sitting in the courtroom today. . . . So was it out of loyalty to Van Brocklin? Was it manipulation on his part?" Sentencing Tr. 195-96

[13]We thus reject the government's argument that an excessive fines analysis is inappropriate because Hastings's forfeiture order seeks to recover proceeds of the crime. See Alexander, 32 F.3d at 1236 ("Forfeiture of proceeds [is not] subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity."). Simply put, Hastings received none of the fruits of the illegal activity. Hastings's forfeiture judgment is thus punitive, not remedial, and subject to the Excessive Fines Clause.

[14]The district court ordered Hastings to forfeit $1,325,910.60; Van Brocklin, $1,395,323.51.

troubled that this steep restitution order may also be disproportionate. In any event, sentencing courts are to consider a number of factors in determining whether to order restitution, see 18 U.S.C. § 3664(a), and should in most cases make specific findings of fact in regard to these factors. Kok v. United States, 17 F.3d 247, 251 (8th Cir. 1994). In this case, the district court made no findings that show it considered these factors, including whether Hastings has the ability to pay restitution. A failure to make such a finding before ordering restitution is an abuse of discretion. United States v. Mitchell, 893 F.2d 935, 936 (8th Cir. 1990). Similarly, the district court did not make required findings of fact showing that it considered the relevant Guideline factors, including ability to pay, in imposing a $10,000 fine against Hastings. See U.S.S.G. § 5E1.2. Such findings are mandatory. United States v. Miller, 995 F.2d 865, 869 (8th Cir. 1993); United States v. Walker, 900 F.2d 1201, 1205-06 (8th Cir. 1990). We therefore vacate Hastings's restitution order and fine, subject to new determinations by the district court based on the required findings.

**F.    Other Claims**

We have considered defendants' remaining arguments, including challenges to various trial rulings by the district court and Hastings's contention of prosecutorial misconduct. We find these issues to be without merit.

## III. CONCLUSION

The convictions of all defendants are affirmed.  We remand to the district court for resentencing of defendants Van Brocklin, Atterberry, and Pyatt.  We vacate the forfeiture judgment, restitution order, and fine imposed on defendant Hastings, and remand for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.